UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation,<br><br>                Plaintiff,<br>    v.<br><br>JASON P. DECKER and DEBRA A. DECKER, husband and wife and the marital community composed thereof, et al.,<br><br>                Defendants. | CASE NO. 2:24-cv-00253-TL<br><br>ORDER ON MOTION TO DISMISS THIRD-PARTY COMPLAINT |

    This case arises from a chain reaction of events—the legality of which the Parties dispute—set into motion when borrower Elcon Corporation, an Everett, Washington–based electrical contractor, defaulted on a loan from lender KeyBank. Presently before the Court is a motion to dismiss (Dkt. No. 46) brought by Third-Party Defendants KeyBank and Dale Conder, in response to a Third-Party Complaint (Dkt. No. 20) filed by several Defendants named in the

original Complaint. Having considered the relevant record, the Court GRANTS the motion to dismiss.

I.  **BACKGROUND**

**A.  The Parties**

The Third-Party Plaintiffs here are: (1) Jason P. Decker, Debra A. Decker, and the marital community composed thereof; (2) WilDec, LLC; and (3) Decker & Williams, LLC. Dkt. No. 20 at 2. These plaintiffs represent a subset of the Defendants named in the original Complaint (Dkt. No. 1).[1] They also refer to themselves collectively as "the Decker Defendants." *Id.* To maintain consistency and continuity, the Court will do the same.

The Third-Party Defendants here are KeyBank, N.A., and Dale Conder. *Id.* Dale Conder is employed by KeyBank as a Senior Vice President. Dkt. No. 20 ¶ D3. The Third-Party Complaint includes two causes of action against both KeyBank and Mr. Conder, and one against KeyBank exclusively. For their part, KeyBank and Mr. Conder defend themselves collectively and treat their actions as one and the same. *See generally* Dkt. Nos. 20, 46. To maintain consistency and continuity, the Court will thus refer to Third-Party Defendants KeyBank and Dale Conder collectively as "KeyBank."

**B.  Travelers's Surety Bonds for Elcon**

In July 2017, Plaintiff Travelers Casualty and Surety Company of America ("Travelers") issued surety bonds for Elcon Corporation ("Elcon"), an electrical subcontractor engaged in several public-works projects in the Pacific Northwest. Dkt. No. 1 ¶¶ 10, 12, 21–22. In connection with the bond issuance, numerous parties executed and delivered to Travelers a General Agreement of Indemnity ("GAI"). *Id.* ¶ 10. Included within this group were: (1) Jason P.

---

[1] Travelers Casualty and Surety Company of America is the original Plaintiff in this case. *See* Dkt. No. 1.

1   Decker, Debra Decker, and the marital community composed thereof;[2] (2) Anthony Ray Schults,
2   Karen Koppel Schults, and the marital community composed thereof; (3) Scott Elden Wood,
3   Olivia Ferreira-Wood, and the marital community composed thereof; (4) Passage, Inc.;
4   (5) WilDec, LLC; and (6) Decker & Williams, LLC. *Id.* Under the GAI, these parties became
5   indemnitors for the surety bonds. *Id.* ¶ 13. The GAI obligates the indemnitors "to exonerate,
6   indemnify, and save Travelers harmless from and against all 'Loss,'" as that term is defined in
7   the GAI. *Id.* ¶ 14; *see id.* ¶ 16. The GAI further obligates the indemnitors to, *inter alia*, "deposit
8   with [Travelers], upon demand, an amount as determined by [Travelers] sufficient to discharge
9   any Loss or anticipated Loss." *Id.* ¶ 17. And the GAI requires the indemnitors to "furnish upon
10  demand" various records, "including but not limited to, books, papers, records, documents,
11  contracts, reports, financial information, accounts and electronically stored information." *Id.* ¶ 18.
12          At some point during Summer 2023, a "loss," as defined in the GAI, occurred, thereby
13  triggering the indemnitors' obligations to Travelers under the GAI. *Id.* ¶¶ 23–26. In the original
14  Complaint, Travelers alleges that the indemnitors have not performed their obligations under the
15  GAI; Travelers seeks both legal and equitable relief. *Id.* ¶¶ 27–57.

16  **C.    KeyBank's Loans to Elcon**

17          In January 2022, Elcon signed a line-of-credit ("LOC") loan with KeyBank to borrow up
18  to the principal amount of $7,000,000. Dkt. No. 20 ¶¶ D4, 5. In July 2022, Elcon signed a
19  business loan agreement with KeyBank, which had the effect of extending the maturity date of
20  the LOC loan by approximately one year. *Id.* ¶ D5. In the business loan agreement, Elcon

---

[2] Jason Decker is the 49 percent minority owner of Elcon Corporation. Dkt. No. 20 ¶ D1.

ORDER ON MOTION TO DISMISS THIRD-PARTY COMPLAINT - 3

"agreed to make mandatory payments [to KeyBank] at any time the aggregate principal amount of the Loan exceeded Elcon's 'Borrowing Base.'"[3] *Id.* ¶ D6.

On April 24, 2023, KeyBank issued Elcon a "Notice of Default." *Id.* ¶ D9. In the Notice of Default, KeyBank claimed that "Elcon lacked sufficient working capital to maintain the Borrowing Base for its LOC." *Id.* Elcon does not appear to have disputed the propriety or accuracy of the Notice of Default. Upon the issuance of the Notice of Default, KeyBank and Elcon began negotiations over Elcon's response, in part to "facilitate a reasonably prompt cure of the Existing Defaults." *Id.*

By June 7, 2023, these negotiations between Elcon and KeyBank appear to have broken down. *Id.* ¶ D12. At a Zoom meeting held on that date, "KeyBank threatened to issue a UCC 9-607 Notice[4] . . . to Elcon's upstream contract, Absher [Construction Company], directing Absher to withhold all contract receivables from Elcon and instead turn them over to KeyBank." *Id.* Elcon protested and advised KeyBank that issuing the 9-607 Notice was "against Key's own interest." *Id.* Elcon reminded KeyBank of Travelers's surety bonds and advised that those bonds gave Travelers priority over KeyBank in the event of a creditors' run on Elcon. *Id.*; *see id.* ¶ D13 ("It is further noteworthy that the Travelers GIA has been in existence long before the KeyBank

---

[3] A "borrowing base" is an amount of collateral used as a baseline to calculate the amount of a borrower's line of credit. *See Radish Seed Growers Ass'n v. Nw. Bank*, No. C17-716, 2017 WL 6048169, at *3 (D. Or. Oct. 3, 2017). In the agreement between Elcon and KeyBank, the borrowing base was the lesser of $7,000,000 or 85 percent of the aggregate amount of Elcon's "Eligible Accounts." Dkt. No. 46-4 at 8.

[4] Within the context of secured transactions, a "9-607 Notice" refers to Article 9, Section 607, of the Uniform Commercial Code ("U.C.C."). In Washington, the U.C.C. is codified in Title 62A of the Revised Code of Washington; Section 9-607 is located at RCW 62A.9A-607. Under U.C.C. 9-607, in the event of a debtor's default, a secured creditor may "notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party." RCW 62A.9A-607. Here, this meant that KeyBank, as Elcon's secured creditor, could instruct entities to whom Elcon was a subcontractor to pay KeyBank, not Elcon, for work that Elcon performed on their contract. Importantly, as a practical effect of receiving a 9-607 Notice, a third party with whom the defaulting debtor has a contract necessarily learns of the default and, consequently, may: (1) surmise that the defaulting debtor is experiencing financial difficulty; (2) if contractually appropriate, declare the defaulting debtor to be in default of its contract with the third party; and/or (3) take other steps to protect its interests, pursuant to its contract with the defaulting debtor.

Loan Agreement, defeating any argument KeyBank might try to make on the basis of being first in time.").

KeyBank was not dissuaded from issuing the 9-607 Notices. On June 30, 2023, KeyBank "issued a 9-607 Notice to Absher Construction to freeze payments to Elcon." *Id.* ¶ D15. On July 17, 2023, KeyBank issued 13 more 9-607 Notices "on all of Elcon's bonded projects." *Id.* ¶ D20. Following KeyBank's issuance of the 9-607 Notices, "[e]ach project systematically declared Elcon in default on the jobs, replaced them, and declared Elcon responsible for consequential damages and attorney-fees [*sic*]. . . . Travelers . . . stepped in to assert [its] priority position to the receivables (if any) due on the projects." *Id.* ¶ D23.

On March 25, 2024, the Decker Defendants filed an answer, cross-claim, and the instant Third-Party Complaint. At the crux of the complaint is the Decker Defendants' allegation that, as a consequence of KeyBank's issuance of the 9-607 Notices,

> millions of [dollars' worth of] profitable projects turned upside down into liabilities. . . . [A]s a result of the defaults triggered by issuance of the subject 9-607 Notices, and the replacement of Elcon on each project, Travelers' [*sic*] is now claiming in excess of $6,394,455.47 in this lawsuit attendant to these same projects.

*Id.* ¶ 25. As indemnitors for the Travelers surety bonds, the Decker Defendants are now responsible for indemnifying Travelers and performing their obligations under the GAI. Travelers's complaint (Dkt. No. 1) is premised in part on allegations that the Decker Defendants have breached the GAI and not otherwise fulfilled their obligations under that contract. In the Third-Party Complaint, then, the Decker Defendants allege that, had KeyBank not issued the 9-607 Notices, their obligations under the GAI would not have been triggered, and they would not now be defending themselves in Travelers's lawsuit.

//

//

## II. LEGAL STANDARD

A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

## III. DISCUSSION

### A. Documents Referenced in the Third-Party Complaint

On a motion to dismiss, the Court may consider materials incorporated into the complaint or matters of public record. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). The Court may also "consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Id.*

The Third-Party Complaint against KeyBank derives from actions that KeyBank took in connection with: (1) a line-of-credit loan that KeyBank made to Elcon; (2) an "earlier-executed Commercial Security Agreement," to which the line-of-credit loan was subject; and (3) a

business loan agreement between KeyBank and Elcon. Dkt. No. 20 ¶¶ D5–6. The Third-Party Complaint describes several relevant provisions in these written instruments, but it does not fully incorporate them by reference. *See generally id.* Additionally, the Third-Party Complaint refers to (and quotes from) a Notice of Default and Reservation of Rights that KeyBank issued to Elcon on April 24, 2023. *Id.* ¶ D9. All of these documents are integral to any understanding of the Decker Defendants' relationship with KeyBank, and to the circumstances under which KeyBank took the allegedly wrongful actions about which the Decker Defendants now complain. *Cf. Coto Settlement*, 593 F.3d at 1038 (citing *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)) (holding it appropriate where district court "consider[ed] an agreement that was not specifically incorporated into the complaint because the complaint 'relie[d] heavily upon its terms and effect' such that the agreement [was] 'integral' to the complaint"). Therefore, the Court will consider the loan documents, which KeyBank attached to its motion to dismiss (Dkt. Nos. 46-2, 46-3, 46-4), and the Notice of Default, which KeyBank attached to its reply (Dkt. No. 49-1).

**B.      Allegations in the Third-Party Complaint**

The Decker Defendants plead three causes of action against Third-Party Defendants KeyBank and Dale Conder. First, the Decker Defendants allege tortious interference with contracts and/or business expectancies against KeyBank and Dale Conder. Dkt. No. 20 ¶¶ D31–54. Second, they plead a claim for equitable subrogation against KeyBank. *Id.* ¶¶ D55–62. And third, they plead a claim for equitable indemnity against KeyBank and Dale Conder. *Id.* ¶¶ D63–69. The Court will address each cause of action in turn.

**1.      Tortious Interference**

Under Washington law, there are five elements to a claim of tortious interference with a contractual relationship or business expectancy:

      (1) [T]he existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 169 Wn. App. 111, 132, 279 P.3d 487 (2012) (quoting *Leingang v. Pierce Cnty. Med. Bureau*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997)).

The Decker Defendants allege that, "By issuing its numerous 9-607 Notices to Elcon's counterparties in their various public works subcontracts, . . . KeyBank specifically intended to disrupt the performance of Elcon on its bonded contracts and place those contracts into immediate default." Dkt. No. 20 ¶ D40. They allege further that "KeyBank intended to trigger Elcon and the Decker Defendants' obligations under their indemnity obligations with Travelers." *Id.* ¶ D41.

In its motion to dismiss, KeyBank asserts four reasons as to why the Decker Defendants' claim for tortious interference must fail. Dkt. No. 46 at 10–16. First, KeyBank argues that the action that the Decker Defendants characterize as interference—namely, KeyBank's issuance of 9-607 Notices—cannot as a matter of law be considered tortious interference, because KeyBank had a contractual right to issue the notices. *Id.* at 10. Second, KeyBank argues that the Decker Defendants fail to satisfy the fourth element of a tortious interference claim, because the actions that KeyBank took were merely part of a contractually and statutorily stipulated process that a similarly situated lender might employ to collect a debt—and therefore not for an improper purpose or by improper means. *Id.* at 12–13. Third, KeyBank argues that the Decker Defendants also fail to satisfy the third element of the claim, because KeyBank's issuance of the 9-607 Notices did not directly result in a breach of contract between the Decker Defendants and anyone else. *Id.* at 13–14. Fourth, KeyBank argues that a recent judgment in a purportedly related case in

Snohomish County Superior Court precludes the Decker Defendants' tortious interference claim on the basis of collateral estoppel. *Cf. KeyBank Nat'l Ass'n v. Williams*, No. 23-2-06104-31 (Snohomish Cnty. Super. Ct. Apr. 12, 2024).[5] Here, the Court is persuaded by KeyBank's first and second arguments and will dismiss the Decker Defendants' claim for tortious interference based on its analysis thereof. Therefore, it need not reach KeyBank's third and fourth arguments.

      KeyBank's first and second arguments are both premised on the principle that, as lender, the bank had available to it the full menu of contractual options afforded to it in the event of the borrower's default. KeyBank argues that it categorically could not have acted for improper purpose or by improper means, because its actions had been contemplated—and, essentially, pre-agreed upon—in its loan agreement(s) with Elcon. *See* Dkt. No. 46 at 13. In contrast, the Decker Defendants contend that KeyBank did not have an "absolute right" to engage in the debt-collection efforts at issue here—*i.e.*, KeyBank's issuance of the 9-607 Notices. The Decker Defendants premise their argument on a presumption that KeyBank acted with malice—specifically, they allege that KeyBank knew that issuing of the 9-607 Notices would, among other things, "destroy all of Elcon's remaining value" and, importantly, "prevent [KeyBank] from collecting *anything* on their contract debts." Dkt. No. 48 at 20 (emphasis in original). The Decker Defendants conclude that, because KeyBank allegedly knew that issuing the 9-607 Notices would make it impossible for the bank to collect its debt from Elcon, it was a "commercially unreasonable" action—and absent any likelihood of improving its financial position, KeyBank could have only issued the notices for the malicious purpose of wrecking a

---

[5] Peter Williams was formerly CEO and 51 percent majority owner of Elcon. Mr. Williams entered into Elcon's loan agreements with KeyBank on Elcon's behalf and, further, personally guaranteed those loans. *See* Dkt. Nos. 46-2, 46-3, 46-4. After Elcon defaulted, KeyBank sued Mr. Williams, his spouse, and their marital community in state court for breach of a guaranty contract. *KeyBank Nat'l Ass'n v. Williams*, No. 23-2-06104-31, at *4. In their defense, the Williamses claimed "commercial unreasonableness and bad faith by [KeyBank] . . . based on [KeyBank's] issuance of the account debtor notices and the effect the notices had on Elcon as a business." *Id.* at *7.

perfectly good company and destroying that company's contractual relationships with others. *Id.* "[KeyBank]," the Decker Defendants argue, "cannot assert a contract right as a privilege justifying tortious interference, when their actions were taken knowing they would actively **harm or impair** (rather than protect) their rights under their own contract, in order to serve their true purpose of harming others." Dkt. No. 48 at 19–20 (emphasis and boldface in original).

Washington law supports KeyBank's position. Washington courts have consistently recognized that "[e]xercising one's legal interests in good faith is not improper interference." *Tacoma Auto Mall*, 169 Wn. App. at 132; *see, e.g.*, *Moore v. Com. Aircraft Interiors, LLC*, 168 Wn. App. 502, 511–12, 278 P.3d 197 (2012) (same); *Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship*, 158 Wn. App. 203, 225, 242 P.3d 1 (2010) (same); *Leingang*, 131 Wn.2d at 157 (same). The two questions, then, are whether KeyBank was: (1) exercising its legal interest; and (2) acting in good faith when it exercised its contractual right to issue the 9-607 Notices. The Court finds that the answer to both is yes.

      **a.**    ***Exercising a Legal Interest***

"A bank should not be deprived of its right [to collect] simply because it has the foresight to obtain collateral in exchange for obligations owed to it. . . . [A] creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied." *Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank of Wash.*, 10 Wn. App. 530, 538, 518 P.2d 734 (1974) (adopting "majority rule" regarding the recovery of secured debt, as described in *Olsen v. Valley Nat'l Bank*, 234 N.E.2d 547, 550 (Ill. App. Ct. 1968)). Further, where the terms of a loan are captured within a contract, "the controlling authority for the [lender's] actions is . . . the contract formed by the demand notes and the rights created by the debtor-creditor relationship of the parties." *Allied Sheet Metal Fabricators*, 10 Wn. App. at 539. Under Washington law, then, if

KeyBank's efforts to collect its debt from Elcon were expressly contemplated in the loan contract(s), then the bank was, in fact, exercising a legal interest.

The plain language of the contract demonstrates that KeyBank's issuance of the 9-607 Notices was in accordance with the terms of its loan agreement with Elcon. The Commercial Security Agreement between KeyBank and Elcon states that:

> Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

Dkt. No. 46-3 at 5. Under the U.C.C. (and, thus, under Title 62A of the Revised Code of Washington), "If so agreed, and in any event after default, a secured party [m]ay notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party." RCW 62A.9A-607(a)(1). Thus, the contractual provision cited above, in tandem with the statutory provision of the U.C.C., permitted KeyBank to issue the 9-607 Notices in the event of default. And to be sure, it is not disputed that an "event of default" occurred. *See* Dkt. No. 49-1 at 1–2.[6]

For their part, the Decker Defendants rely on *Topline Equipment, Inc. v. Stan Witty Land, Inc.*, 31 Wn. App. 86, 93, 639 P.2d 825 (1982), emphasizing that, notwithstanding the debt-collection parameters described in *Allied Sheet Metal Fabricators*, an assertion of one's legal right to act as a defense against tortious interference is valid only where "a person has a definite legal right to act, *without any qualification*." Dkt. No. 48 at 18 (emphasis in original). Yet the Decker Defendants noticeably do not discuss the terms of their agreement that allow KeyBank to notify others of the default, and they do not point out any qualifications that might exist on that

---

[6] As mentioned in Section I.C *supra*, the Decker Defendants do not dispute the validity of KeyBank's Notice of Default (Dkt. No. 49-1).

ORDER ON MOTION TO DISMISS THIRD-PARTY COMPLAINT - 11

legal right. Instead, they focus on their post-default negotiations with KeyBank and reiterate their position that KeyBank's actions destroyed Elcon which, *ipso facto*, made those actions unreasonable. *Id.* at 20; *see also* Dkt. No. 20 at 15–21. The Court is not persuaded.

Moreover, *Topline Equipment* is distinguishable from the facts alleged here. In *Topline Equipment*, the conduct that the Washington Court of Appeals rejected as a creditor's defense to tortious interference was not anything that had been contemplated (and agreed upon) in the loan agreement between the creditor and the debtor. Rather, the creditor there essentially took ad hoc action—including a coercive attempt to preclude the debtor from selling its collateral to a third party—to "assur[e] that its unsecured claims would be satisfied before [the debtor] sold all of its assets." *Topline Equipment*, 31 Wn. App. at 89, 93. Unlike here, where Elcon's loan agreements expressly permitted KeyBank to avail itself of the debt-collection remedies provided for in the U.C.C., there is no indication that the debtor in *Topline Equipment* had affirmatively agreed to permit its creditor to engage in the actions that it did. This distinction renders *Topline Equipment* inapplicable. The Court thus finds that KeyBank had legal right to issue the 9-607 Notices, and that it was exercising a legal interest when it did so.

        **b.**    **Bad Faith**

Under Washington law, when a lender "simply enforce[s] the express terms of the promissory note [at issue], its actions d[o] not constitute bad faith." *Seattle-First Nat'l Bank v. Westwood Lumber, Inc.*, 65 Wn. App. 811, 823, 829 P.2d 1152 (1992), *review denied*, 120 Wn.2d 1010, 841 P.2d 48. Where the contract between a lender and borrower permits the lender to take action that might, "as a practical matter," put the borrower "in trouble because it has lost its financing," such action is not inherently unreasonable. *Allied Sheet Metal Fabricators*, 10 Wn. App. at 534.

"When reviewing issues of state law, a federal court is bound to follow the decisions of a state's highest court in interpreting that state's law." *Ogden Martin Sys., Inc. v. San Bernardino Cnty. Cal.*, 932 F.2d 1284, 1288 (9th Cir. 1991) (quoting *Olympic Sports Prods. v. Universal Athletic Sales Co.*, 760 F.2d 910, 912–13 (9th Cir. 1985)). "If no ruling exists from the highest court of the state, [the federal court] must follow intermediate appellate decisions unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Ogden Martin*, 932 F.2d at 1288–89.

Here, as discussed above, the Washington Court of Appeals held that "simply enforc[ing] the express terms of the promissory note [at issue] . . . d[oes] not constitute bad faith." *Seattle-First Nat'l Bank*, 65 Wn. App at 823. This decision was appealed to the Washington Supreme Court, which denied review, leaving the intermediate appellate decision in place as the operative law on the issue. *Seattle-First Nat'l Bank*, 120 Wn.2d at 1010. The Decker Defendants do not provide any "persuasive data" to indicate that the Washington Supreme Court would have disagreed with state court of appeals had it opted to review the intermediate court's decision. Further, the Court notes that this District Court has favorably cited *Seattle-First National Bank* in finding that a party did not breach its duty of good faith by "enforcing [a] note according to its terms." *Key Bank of Wash. v. Concepcion*, No. C93-1737R, 1994 WL 762157, at *5 (W.D. Wash. Sept. 20, 1994). Therefore, the Court will accept the ruling in *Seattle-First National Bank* as appropriately indicative of Washington law.

Here, Decker Defendants do not contest that they were in default. Nor do they contest that they entered into the agreement with KeyBank. Under the terms of that agreement, KeyBank had a contractual and statutory right to issue the Notices. *See generally* Dkt. No. 49-1. And given that it had a contractual and statutory right to issue the Notices, the Court FINDS as a matter of

law that KeyBank did not act in bad faith when it did so. *See Seattle-First Nat'l Bank*, 65 Wn. App. at 823.

Moreover, the Court notes that the state court in *Key Bank v. Williams* found on a motion for summary judgment:

> no genuine issue as to any material fact that Elcon defaulted on the Loan Agreement, that Mr. Williams is in default in his contractual obligations to [KeyBank] under the terms of the . . . personal guaranty, and that [KeyBank] is entitled to judgment against [the Williamses] jointly and severally for the balance owed [KeyBank] by Elcon.

*Key Bank v. Williams*, No. 23-2-06104-31, at *7–8. In its ruling, the court rejected the Williamses' argument that KeyBank had acted in a commercially unreasonable manner and/or in bad faith. *Id.* at *8. KeyBank, the court determined, had a "right to do what it did under the terms of the parties' agreement and [its] statutory rights under the Uniform Commercial Code." *Id.* at *9. While not controlling here, the *Williams* decision is in line with *Seattle-First National Bank*, and this Court agrees with the finding.

Therefore, as to the Decker Defendants' claim of tortious interference, the Court GRANTS KeyBank's motion to dismiss.

**2.    Equitable Subrogation**

"Washington's doctrine of equitable subrogation enables an insurer that has paid its insured's loss to recoup that payment from the party responsible for the loss." *Cypress Ins. Co. v. SK Hynix Am., Inc.*, 365 F. Supp. 3d 1142, 1148 (W.D. Wash. 2019) (citing *Trinity Universal Ins. Co. of Kansas v. Ohio Cas. Ins. Co.*, 176 Wn. App. 185, 200, 312 P.3d 976 (2013)). Equitable subrogation "applies where one advances money to pay the debt of another to protect his own rights." *Newcomer v. Masini*, 45 Wn. App. 284, 286, 724 P.2d 1122 (1986). Equitable

subrogation "do[es] not apply where the party seeking reimbursement did not pay the debts of another." *Kottler v. State*, 136 Wn.2d 437, 449 n.12, 963 P.2d 834 (1998).

Here, the Third-Party Complaint does not indicate that the Decker Defendants are entitled to reimbursement, if only because the Decker Defendants do not allege that they have paid anything to anyone. The Decker Defendants' response to KeyBank's motion to dismiss does not cure this deficiency. Indeed, they assert that "Travelers has cognizable causes of action against KeyBank for its failure to act in a commercially reasonable manner and in bad faith," and that they "are allowed to stand in the shoes of Travelers to assert those claims." Dkt. No. 48 at 31. But having a cause of action against KeyBank is not the same thing as paying KeyBank. And as the doctrine of equitable subrogation is an equitable remedy, constructed to make one party whole *after* they have paid off another party's debt, it does not apply where no one has paid anything—and where no one needs a court's intervention to make them whole. *See Newcomer*, 45 Wn. App. at 286; *Kottler*, 136 Wn.2d at 449 n.12. It is therefore inappropriate here.

Therefore, as to the Decker Defendants' claim of equitable subrogation, the Court GRANTS KeyBank's motion to dismiss.

### 3. Equitable Indemnity

Equitable indemnity is a remedy for situations where, "when the natural and proximate consequences of a wrongful act of defendant involve plaintiff in litigation with others, there may as a general rule be a recovery of damages for reasonable expenses incurred in litigation, including attorney's fees." *Manning v. Loidhamer*, 13 Wn. App. 766, 769, 538 P.2d 136 (1975). Here, it appears that the Decker Defendants allege that KeyBank's wrongful act resulted in their involvement in litigation with Travelers, the original Plaintiff in this matter. *See* Dkt. No. 20 ¶¶ D63–69; *see also* Section I.C *supra*.

But as discussed in Section III.B.1 *supra*, the Decker Defendants have not adequately alleged any wrongdoing on the part of KeyBank. They do allege that "KeyBank and Conder engaged in wrongful acts against the Decker Defendants, including but not limited to intentionally interfering with the Decker Defendants' contract with Travelers and taking commercially unreasonable collection efforts." *Id.* ¶ D64. But the Court has found that the conduct alleged was not, as a matter of law, wrongful. It thus follows that it is immaterial whether KeyBank's issuance of the 9-607 Notices did in fact result in litigation between Travelers and the Decker Defendants with respect to a claim of equitable indemnity, because there was nothing improper about the issuance of the Notices in the first place. If KeyBank did not commit a wrongful act, then KeyBank need not indemnify the Decker Defendants for the results thereof.

Therefore, as to the Decker Defendants' claim for equitable indemnity, the Court GRANTS KeyBank's motion to dismiss.

### C.  Futility of Amendment

KeyBank argues that all of the Decker Defendants' claims "fail as a matter of law and [that] there are no facts they could allege in an amended complaint that could cure their meritless claims." Dkt. No. 46 at 21. For their part, the Decker Defendants only discuss the possible amendment of their claims with respect to their allegations that KeyBank's actions were "commercial[ly] unreasonable[]." Dkt. No. 48 at 36 n.11. The Decker Defendants assert that they are willing to amend their claims should the Court find KeyBank's motion to dismiss persuasive, but the amendment(s) they propose consist only of an "expert opinion declaration" provided "as an offer of proof." Dkt. No. 48 at 36 n.11, 42–48. But as discussed above, the Court has found that KeyBank's actions were expressly contemplated and provided for in the contract KeyBank entered into with Elcon. And however expert, the declaration does not address the fundamental

and inescapable flaws in the Decker Defendants' claims: (1) that the creditor-debtor relationship between KeyBank and Elcon was controlled by contract; (2) that in the event of Elcon's default, the contract expressly provided for KeyBank's issuance of U.C.C.-prescribed remedies; and (3) that under Washington law, taking contractually prescribed action to enforce the terms of a promissory note is not bad faith and, therefore, not commercially unreasonable.

Therefore, to the extent that this footnote represents a proposed amendment to the Third-Party Complaint, the Court finds it unavailing. Even if it were added to the factual allegations as presently pleaded, all claims in the Third-Party Complaint would still fail as a matter of law. Therefore, the Court finds that amending the Third-Party Complaint would be futile and, accordingly, sees no reason not to dismiss it with prejudice. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

### IV. CONCLUSION

KeyBank's Motion to Dismiss Third-Party Complaint (Dkt. No. 46) is GRANTED. The Decker Defendants' third-party complaint (Dkt. No. 20) is DISMISSED WITH PREJUDICE.

Dated this 28th day of October 2024.

Tana Lin
United States District Judge